UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHEENA JEAN HEISER,                :
                                   :CIVIL ACTION NO. 3:15-CV-1334
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's

denial of Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social

Security Act, alleging an onset date of April 26, 2010.  (Doc. 1.)

The Administrative Law Judge ("ALJ") who evaluated the claim,

Sharon Zanotto, concluded in her January 31, 2014, decision that

Plaintiff's severe impairments of Bipolar Disorder, Posttraumatic

Stress Disorder ("PTSD"), and Migraine Headaches did not alone or

in combination with her multiple non-severe impairments meet or

equal the listings.  (R. 46-47.)  She also found that Plaintiff had

the residual function capacity ("RFC") to perform light work with

certain nonexertional limitations and that she was capable of

performing jobs that existed in significant numbers in the national

economy.  (R. 50-59.)  ALJ Zanotto therefore found Plaintiff was

not disabled under the Act from April 26, 2010, through the date of

the decision.  (R. 59.)

With this action, Plaintiff asserts that the case should be remanded for further proceedings because the ALJ's finding that Plaintiff could perform a range of unskilled work is not supported by substantial evidence.  (Doc. 7 at 15.)  After careful consideration of the administrative record and the parties' filings, I conclude this appeal is properly denied.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on March 1, 2012, and for SSI on February 13, 2013.  (R. 43.)  Plaintiff alleged disability beginning on April 26, 2010.  (*Id.*)  In an undated disability report Plaintiff claimed disability due to bipolar affective disorder, migraine headaches, anxiety disorder, panic disorder, and depression.  (R. 228.)  The claims were initially denied on June 7, 2012, and Plaintiff filed a request for a hearing before an ALJ on February 21, 2012.   (R. 38-39, 43.)

A hearing was held before ALJ Zanotto on October 29, 2013. (R. 65-130.)  Plaintiff, accompanied by her attorney, testified as did Vocational Expert ("VE") Cheryl Buston.  (R. 65.)  As noted above, the ALJ issued her unfavorable decision on January 31, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 59.)

On February 21, 2014, Plaintiff filed a Request for Review

2

with the Appeals Council.  (R. 38-39.)  Noting that additional information submitted did not affect the ALJ decision because it addressed a later time period, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on May 8, 2015. (R. 1-7.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On July 7, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision. (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 21, 2015.  (Docs. 5, 6.)  Plaintiff filed her supporting brief on November 5, 2015.  (Doc. 7.)  After Defendant requested, and was granted, an extension of time to file her opposition brief (Docs. 8, 9), Defendant filed her brief on January 8, 2015 (Doc. 10).  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on September 12, 1984--she was twenty-five years old on the alleged onset date of April 26, 2010, and twenty-nine years old on the date of the ALJ decision.  (R. 58; Doc. 7 at 2.)  Plaintiff has a high school education and some college credits.  (R. 58; Doc. 7 at 2.)  Plaintiff has past relevant work as a dispatcher, customer service representative, front desk clerk, and cashier.  (R. 58.)

1. **Impairment Evidence**

a. _Mental Health Impairments_

Plaintiff saw John Pugh, Ph.D., on April 27, 2010, following a fire at the apartment where she lived with her boyfriend and his two brothers which she points to as the cause of her increased symptoms. (R. 75, 563.)  Dr. Pugh, who had seen Plaintiff on five previous visits beginning in May 2009 (Doc. 7 at 1 (citing R. 292-95, 297-99)), noted that Plaintiff lost all of her things in the fire and this

> caused understandably a great amount of distress.  Her bipolar symptoms have increased and she began cutting again as well.  Her boyfriend was very supportive. She began to realize during this session that the loss of her things was so traumatic to her because it validated her mother's behavior and words that were so very abusive to her.  She seeks the endorphin release from cutting herself to outset [sic] all of the years of emotional abandonment that she has experienced in the past.

(R. 563.)  Dr. Pugh diagnosed Bipolar II depressed, and PTSD with a GAF of 50.  (_Id._)  He added that Plaintiff had been making great progress until she lost her insurance.  (_Id._)

On May 4, 2010, Dr. Pugh recorded similar observations and noted that Plaintiff was attempting to gain a college degree. (R. 564.)  His diagnosis remained the same, and his recommendations included that Plaintiff should be given necessary extensions to take exams and turn in assignments to accommodate her while undergoing the displacement and stress related to the fire.  (R.

4

564-65.)  Dr. Pugh also commented that Plaintiff may need to take a
hiatus from academic work at the end of the semester.  (R. 565.)

On May 18, 2010, Plaintiff again saw Dr. Pugh.  (R. 566.)  He
noted that her relationship with her boyfriend and living
arrangement (boyfriend, his two brothers and their girlfriends all
living in a "dump of an apartment") had deteriorated.  (*Id.*) Dr.
Pugh wrote in his notes that "Sheena needs to look out for herself
and get back to work and find her own place to deal with him more
appropriately from a position of strength rather than great
dependency."  (*Id.*)  His diagnosis remained the same.  (*Id.*)

On June 7, 2010, Dr. Pugh recorded that Plaintiff's living
situation and relationship had further deteriorated and her
diagnosis remained the same.  (R. 567.)

On July 6, 2010, Plaintiff reported some progress on the
boyfriend and living situation fronts.  (R. 568.)  His summary
contained the following comments:

> She wants to move to permanent disability
> though she still wants to work some part-
> time.  Even though she has bipolar illness
> and possibly diabetes, it may be difficult to
> prove a case of permanent disability.  While
> permanent disability would give her financial
> security, she had aspired to be different
> from her sister and mother who are on
> disability.  However, she has repeatedly
> failed over again to be successful without
> regressing into symptoms that be [sic] more
> than just a psychosocial adjustment.

(*Id.*)

At Plaintiff's July 13, 2010, visit with Dr. Pugh, he noted

5

that the paperwork for her temporary disability was completed at the sessions and Plaintiff was intending to apply for full disability. (R. 569.) He added that Plaintiff reported she had been suspended from HACC for unauthorized withdrawal from her class in April but she had been accepted at Phoenix University and thought that she could work part-time in conjunction with her disability if she gained greater qualifications and credentials. (*Id.*)

Plaintiff next saw Dr. Pugh on November 30, 2010, at which time she reported that she had broken up with her boyfriend and hoped to get a place of her own which Dr. Pugh found to be a step toward leaving the destructive culture she was accustomed to living in. (R. 570.) Plaintiff reported that she was trying to get back into school and restart a program in criminal justice. (*Id.*)

The next visit of record with Dr. Pugh was on February 22, 2012, at which time Plaintiff was still living with her boyfriend, whom she reported to be more concerned with sending money to his parents in Haiti than with Plaintiff and her daughter. (R. 571.) Plaintiff reported that she had stopped taking her bipolar medication while pregnant and breastfeeding. (*Id.*)

On May 25, 2012, Plaintiff reported that she continued to be off her medications due to breast feeding and she had increased symptoms "ranging from panic attacks to depression with a sense of being overwhelmed with life." (R. 572.) Though Plaintiff had

moved out of her boyfriend's house, she was considering returning due to living difficulties with her sister.  (*Id.*)

On June 6, 2012, Dr. Pugh noted that Plaintiff was taking Zoloft alone while nursing her daughter, she cycled through mood swings every one to three weeks with crying and irritability to hyperactivity with no need for much sleep.  (R. 573.)  He noted that he would track her changes in mood swings to better anticipate and thus minimize the effect on her.  (*Id.*)

On June 13, 2012, Dr. Pugh noted symptoms of anxiety, family tension, self-doubt, and inferiority.  (R. 574.)  He recorded that Plaintiff continued to struggle with her living situation with her sister, had pretty much given up on her boyfriend being a traditional father, and believed that she would eventually get disability.  (*Id.*)  Dr. Pugh noted that he informed Plaintiff "that a diagnosis is not enough to gain disability" and Plaintiff believed that with cash assistance and babysitting she could maintain her home.  (*Id.*)  In June 27, 2012, Plaintiff continued to report family problems.  (R. 575.)

Plaintiff saw Dr. Pugh on five occasions from September 19, 2012, through November 28, 2012.  (R. 583-87.)  In October, Plaintiff reported she was babysitting and difficulties arose when the mother got upset because Plaintiff would not put her daughter on the floor because the woman's house was too dirty.  (R. 586-87.) Plaintiff reported she was very stressed by these difficulties, she

7

did not want her daughter to be cared for by anyone else, and she was able to contact someone else for babysitting where she would make about the same money. (*Id.*)  During this period, Dr. Pugh's notes indicate Plaintiff reported that her living situation with her sister and other family relationships became more problematic, she sought medical help for her growing anxiety, and she contemplated getting some online training that would be free as she could not afford tuition.  (R. 583-87.)

From January through October 2013, Plaintiff saw Dr. Pugh over ten times with most reported problems stemming from family relationships and stress over school difficulties.  (R. 588-95, 606-09.)  Dr. Pugh's notes indicate Plaintiff's student loan was reinstated, she planned to pursue early childhood education so she could work and also care for her daughter in a facility, she identified ways to boost her confidence and methods to achieve them, she related problems related to school and ways to address them, and she moved in with her mother on a temporary basis to improve her living situation.  (R. 590, 606.)

Plaintiff reported depression and anxiety to her primary care doctor, Curtis Hershey, M.D., who prescribed her psychiatric medications and monitored their effectiveness.  (*See, e.g.*, 642-45, 771.)  Records show that Plaintiff  consistently had normal mood and affect as well as normal behavior and judgment.  (R. 376, 442, 459, 629, 644-45, 653, 662, 673, 701, 709, 719, 727, 736, 752,

781.)  At times Dr. Hershey specifically noted that Plaintiff's anxiety was stable (even though she was off her medications due to pregnancy) and she denied depression, although she did have social anxiety which was worsened with going to school. (*See*, *e.g.*, R. 432, 449.)  At other times, as in November 2012, Dr. Hershey recorded worsening anxiety and panic attacks along with the observation that Plaintiff had been off her bipolar medications for almost two years due to pregnancy and breastfeeding and she preferred to take medications as needed rather than daily.  (R. 769.)  He resumed Sertraline and noted that resuming Depakote and Lamictal should be considered.  (R. 771.)  In February 2013, Dr. Hershey noted that Plaintiff was tolerating her psychiatric medications well and she denied depressed mood, crying spells, anxiety, impaired concentration or suicidal ideation.  (R. 779.) He added that resuming school was a continued stressor, the general status of Plaintiff's depression was "not ideally controlled," and he wanted to resume bipolar medications "now that she is done nursing."  (*Id.*)

b.  *Migraine Headaches*

Dr. Hershey treated Plaintiff for worsening headaches after the 2010 fire.  (R. 627.)  On April 25, 2010, he noted that the headaches had previously been reasonably controlled but she had not yet shown improvement with Depakote.  (*Id.*)  Dr. Hershey's diagnoses included migraine headaches with a notation regarding

previously effective medications.  (*Id.*)  His plan to treat the headaches was to continue Depakote, renew Imitrex for prophylaxis, and prescribe Vicodin for rare nighttime use.  (R. 628.)  He recorded that Plaintiff was planning to take a medical leave from work and wanted him to complete Family Medical Leave Act ("FMLA") paperwork.  (*Id.*)

In November 2010, after noting that Plaintiff was not taking her psychiatric medication for the previous four to five months due to a lapse of insurance and that she wanted to resume medication (Lamictal) which had helped in the past, Dr. Hershey again noted Plaintiff's headaches had been worse since she stopped taking her medication, adding that Imitrex had helped in the past and Plaintiff had an appointment with neurology in December.  (R. 642-43.)  He also noted that he would consider Elavil or Inderal.  (R. 645.)

In January 2011, Dr. Hershey reported that Plaintiff's headaches were controlled with the addition of Inderal.  (R. 661.)  He added "[n]o concerns, no refills needed" regarding this problem.  (*Id.*)

In April 2011, Plaintiff stopped taking her medications due to pregnancy.  (R. 673.)  In July, Dr. Hershey recorded that the headaches had been pretty well controlled during her pregnancy but she had experienced a few headaches recently.  (R. 681.)  On September 2, 2011, Dr. Hershey noted the headaches had been worse

the preceding few weeks and seemed to be triggered by the increased anxiety of going to school.  (R. 690-91.)  He also noted that Tylenol with codeine helped but Plaintiff can't take it when she has to go to school.  (R. 691.)  Dr. Hershey made similar comments on September 16, 2011, and October 7, 2011, but added that the headaches had been better since Plaintiff had been out of school. (R. 700, 708.)

On December 12, 2011, Plaintiff complained of daily continuous headaches over the preceding few months which were briefly relieved by acetominaphen.  (R. 717.)  Notes indicated they were not accompanied by symptoms such as nausea, vomiting or hypersensitivity.  (*Id.*)  Dr. Hershey noted Plaintiff likely had recurrent migraine/tension headache disorder and he planned to resume Inderal (adding that he discussed safety when breastfeeding) and prescribed Tylenol with codeine for severe headaches.  (R. 719.)

In January 2012, Dr. Hershey recorded Plaintiff's headaches to be much improved with the start of Inderal four weeks earlier.  (R. 726.)  He noted that Plaintiff reported she continued to have one or two headaches a week that lasted for two hours; they were relieved by acetaminophen "briefly" and were not accompanied by symptoms such as nausea, vomiting, hypersensitivity or dizziness. (R. 726.)  He planned to see her again in three months.  (R. 727.)

In April 2012 Plaintiff associated symptoms of back pain and

insomnia (rare) with her headaches and "pertinent negatives" included no dizziness, nausea or vomiting.  (R. 734.)  In May the headaches were recorded to be less frequent and "[b]etter with Inderal and latest addition of zoloft."  (R. 751.)

At her November 7, 2012, office visit, Dr. Hershey recorded that Plaintiff's headaches were stable after she had resumed Inderal one month earlier.  (R. 770.)  She reported that Aleve helped her headaches which she got about twice per week.  (*Id.*)

On February 21, 2013, Plaintiff's migraine headaches were noted to be controlled and her prescription for Inderal was refilled.[1]  (R. 781.)

## 2. **Opinion Evidence**

An undated opinion from Dr. Pugh indicates that Plaintiff had slight limitations in her abilities to understand, remember and carry out short, simple instructions, make judgments on simple work-related decisions, and interact appropriately with the public; she had moderate limitations in her abilities to understand, remember, and carry out detailed instructions, interact appropriately with supervisors and co-workers, and respond appropriately to changes in a routine work setting; and she had a marked limitation in her ability to respond appropriately to work

---

[1]  As noted by Defendant, Plaintiff appeared to report headaches only on one or two occasions between June 2012 and July 2013 despite seeking treatment for other conditions.  (R. 755-815.)

pressure in a usual work setting.  (R. 291.)

On May 24, 2012, Dr. Pugh conducted a consultative examination/evaluation at the request of the state agency.  (R. 502-07.)  He reported that he had treated Plaintiff sporadically over the preceding five years, she had not been hospitalized during that period but she had "a great amount of outpatient work through her family physician, who was supplying her with prescription medications for bipolar condition as well as antidepressants and antianxiety medications."  (R. 502-03.)  He noted that at the time of the examination Plaintiff was moderately depressed and her emotional expression was mostly flat, which he attributed to Plaintiff's reported tiredness.  (R. 503.)  Dr. Pugh commented on the emotional toll of Plaintiff's living with her sister and Plaintiff's increased symptoms related to stopping her medications due to breastfeeding her daughter.  (R. 503-04.)  Dr. Pugh recorded that Plaintiff performed serial sevens with one mistake, her orientation seemed rather normal to place, person and time, her remote memory seemed good, and her recent memory and immediate recall were good.  (R. 504-05.)  He noted that stress seemed to upset Plaintiff's concentration which in turn affected her memory. (R. 505.)  Dr. Pugh found that her conditions of bipolar disorder and PTSD would probably continue indefinitely into the future but there was some potential for improvement.  (*Id.*)  Opining on effects of her impairment on function, Dr. Pugh concluded that

Plaintiff seemed to have the intelligence to know what to do and how to do it but she lacked the mental stamina to keep up with demands due to racing thoughts and her conditions. (*Id.*)  He added that paranoia and fear of rejection complicated her thought process and judgment with others. (*Id.*)  He also noted limitations with concentration, persistence or pace because of "low energy due to the lack of mental stamina to plan her work and continue to process as needed, and so therefore the demands of her life need to be greatly reduced for her to be able to keep up." (*Id.*)  In a form assessment, Dr. Pugh opined that Plaintiff had moderate difficulties understanding and remembering detailed instructions, carrying out detailed instructions and making judgments on simple work-related decisions. (R. 506.)  He found Plaintiff had marked difficulties interacting appropriately with co-workers and responding appropriately to changes in a routine work setting, and she had extreme difficulties interacting appropriately with the public and supervisors and responding appropriately to work pressure in a usual work setting. (*Id.*)  Dr. Pugh identified additional problems to be Plaintiff's inability to take medications because of breastfeeding and her stamina because of bipolar related sleep issues. (R. 507.)

On June 6, 2012, Jonathan Rightmyer, Ph.D., a state agency reviewer, concluded that Plaintiff had the severe impairments of affective disorders and anxiety disorders with mild restrictions in

14

her activities of daily living and moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace.  (R. 134-35.)  He concluded that Plaintiff could do simple, routine tasks.  (R. 138.)

In a July 16, 2012, letter to Plaintiff's attorneys, Dr. Pugh laid out the reasons he thought Plaintiff should receive disability.  (R. 508.)  He explained that she had previously had problems with work when taking medications such as irritability with supervisors, unusual sleep patterns, and impulsivity which could lead to poor judgment.  (*Id.*)  After noting that Plaintiff was not on medication at the time, Dr. Pugh stated "[i]f she were to attempt to work now, it would be worse than when she was taking the full course of medication."  (*Id.*)

On September 5, 2012, Dr. Pugh completed a Psychological Impairment Questionnaire.  (R. 610-17.)  His diagnosis of Plaintiff's condition was that she was overwhelmed with stress and turned to radical affective responses to the stress and then to withdrawal and escapes to the care of her daughter as her only comfort in life.  (R. 610.)  He evaluated her to have Bipolar Disorder II and PTSD with a GAF of 50.  (*Id.*)  Dr. Pugh's prognosis is partially illegible but he references Plaintiff's relationship with her sister and Plaintiff's expectation that "the future would hold more hope in raising her daughter."  (*Id.*)  Dr. Pugh identified the following clinical findings (which were presented in

checklist form) as demonstrative and/or supportive of his diagnosis: appetite disturbance with weight change; sleep disturbance; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive lack of interest; psychomotor retardation; paranoia or inappropriate suspiciousness; difficulty thinking or concentrating; social withdrawal or isolation; illogical thinking or loosening of associations; decreased energy; manic syndrome; obsessions or compulsions; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; hostility and irritability; and pathological dependence or passivity.  (R. 611.)  He added that the family source of Plaintiff's trauma remained active.  (*Id.*)  Fluctuating mood, anxiety, irritability, withdrawal and obsessive fears were identified as Plaintiff's main symptoms, with fluctuating mood and depression the most severe.  (R. 612.)  Dr. Pugh further opined that Plaintiff was mildly limited in her ability to interact appropriately with the general public and to ask simple questions, to understand and remember detailed instructions, to sustain ordinary routine without supervision, and travel to unfamiliar places and use public transportation; she was moderately limited in her ability to make simple work related decisions, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to carry out

16

detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, and to set realistic goals or make plans independently; she was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to maintain attention and concentration for extended periods, and to work in coordination or proximity to others without being distracted by them.  (R. 613-15.)  Dr. Pugh noted that Plaintiff had no difficulties in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to remember locations and work-like procedures, to understand and remember one or two step instructions, to carry out one or two-step instructions, or to be aware of normal hazards and take appropriate precautions.  (*Id.*) Dr. Pugh noted that Plaintiff had experienced panic attacks every workday when she worked two years earlier.  (R. 615.)  Dr. Pugh also opined that Plaintiff was capable of tolerating low work stress, adding that outcomes for moderate to high stress exacerbated her PTSD and bipolar symptoms.  (R. 616.)  He estimated that Plaintiff would miss more than three days per month because of her symptoms and that the earliest date his description of symptoms began was December 11, 2008.  (R. 617.)

On September 30, 2013, Dr. Hershey completed a Headaches

Impairment Questionnaire.  (R. 597-602.)  His prognosis was "good" though he noted that migraines are often chronic.  (R. 597.)  He noted that Plaintiff's headaches were intermittent and moderately intense, she had a headache two to three times a week and they lasted several hours.  (R. 597-98.)  He said that nausea/vomiting, photosensitivity, and visual disturbances were associated with her headaches, and bright lights, stress, moving around, and noise made them worse.  (R. 599.)  Dr. Hershey identified anxiety/tension and migraine as impairments that could reasonably be expected to explain the headaches.  (*Id.*)  He identified "rest in dark, quiet room & take abortive meds" as the instructions Plaintiff is to follow when she gets a headache.  (*Id.*)  Dr. Hershey indicated that he had been able to completely relieve the pain without unacceptable side effects.  (R. 600.)  In response to the question of how often Plaintiff's experience of pain was severe enough to interfere with attention and concentration, Dr. Hershey circled "Periodically" but he added the handwritten note, "difficult for me to know."  (*Id.*)  He opined that Plaintiff was not a malingerer, she would be precluded from performing even basic work activities and need a break from the workplace when she had a headache, she would likely be absent from work two to three times a month as a result of her impairments, and there were no other limitations that affected her ability to work at a regular job on a sustained basis. (R. 601.)

3.   **Hearing Testimony**

At the October 29, 2013, hearing held before ALJ Zanotto, Plaintiff, represented by her attorney, testified, as did Vocational Expert, Cheryl Buxton.  (R.65.)  When asked by the ALJ about the April 26, 2010, onset date, Plaintiff responded that a house fire triggered an episode with her bipolar disorder, anxiety, and PTSD.  (R. 75.)  She stated that Dr. Pugh, her psychologist at the time, suggested that she take a medical leave.  (R. 75.)  At the time she was working as a monitoring technician at Triangle Refrigeration.  (R. 79.)  When asked if a previous fire had been the trigger, Plaintiff responded that it had been other stress like her best friend being charged with the murder of Plaintiff's boyfriend.  (*Id.*)  (Plaintiff clarified that her current boyfriend rather than the deceased is her daughter's father.  (R. 80.))

Plaintiff testified that, since April 2010, she had worked as a babysitter for about two weeks for about four hours a day at her house.  (*Id.*)  She further testified that she stopped because it was too stressful and full-time was requested.  (*Id.*)

Plaintiff stated that the biggest reason she felt she could not handle a job was her anxiety being around people and the panic attacks which she experienced two to three times per week since 2009.  (R. 80-81.)  She said when she gets a panic attack she gets dizzy and short of breath, and she starts vomiting.  (R. 83.)  When asked by the ALJ why she could work with panic attacks in 2009 and

19

could not after April 2010, Plaintiff responded that she used to get about one a month and now gets them more often.  (R. 83-84.) Plaintiff said she avoided the stress of being around people by going to the grocery store late at night.  (R. 84.)

Plaintiff also testified that her bipolar disorder prevented her from working because all she wants to do is sleep when she is in the depressive stage and she isolates herself from people and gets irritable.  (R. 84-85.)  She stated this began in 2007 or 2008 and since 2010 the highs and lows had become more extreme.  (R. 85.)  Plaintiff also said that she got into fights with coworkers because of her irritability and her boss told her to take a medical leave which she did.  (*Id.*)  She further reported that when she did not have a job to go back to her psychologist told her to apply for disability.  (*Id.*)  This recitation related to an earlier claim, one of four previous applications.  (R. 85-86.)

Plaintiff identified headaches and migraines as additional problems that affected her ability to work.  (R. 98.)  She said she had been having them for about fifteen years but beginning in 2011 they got to the point where she has to lie down and take medication that makes her sleep.  (*Id.*)  Plaintiff added that bright lights and sound started to bother her and the migraines cause vomiting. (R. 99.)

At the time of the hearing, Plaintiff was living with her mother, stepfather, younger sister, and two-year-old daughter.  (R.

76.)  Plaintiff testified that she takes full care of her daughter on a regular basis without any difficulty, does laundry, cooks, cleans (taking breaks when her back hurts), grocery shops, and sometimes helps her mother who is disabled.  (R. 104-06, 116.)  She said on a typical day she gets up between 6:00 and 8:00 and goes to bed about 8:00.  (R. 115.)  She spends her day playing with and caring for her daughter and doing things around the house.  (*Id.*) She added that this was her routine up to twenty-five days per month and the other days she also went to the grocery store and did errands.  (R. 115-16.)

**4.   ALJ Decision**

ALJ Zanotto issued her decision on January 31, 2014, considering evidence submitted up to that date.  (R. 43-60.)  She made the following Findings of Fact and Conclusions of Law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   The claimant has not engaged in substantial gainful activity since April 26, 2010, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: Bipolar Disorder, Posttraumatic Stress Disorder (PTSD), and Migraine Headaches (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional restrictions: limited to unskilled work activity; no interaction with coworkers or the general public; and only occasional interaction with supervisors.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on September 12, 1984 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a

> disability, as defined in the Social
> Security Act, from April 26, 2010,
> through the date of this decision (20
> CFR 404.1520(g) and 416.920(g)).

(R. 45-59.)

ALJ Zanotto thoroughly reviewed the evidence of record and identified the bases for the Findings of Fact and Conclusions of Law. (*Id.*) She notes the long-term nature of Plaintiff's severe impairments, her ability to engage in gainful employment despite the impairments, and her positive responses to medication without side effects. (R. 51-52.)

Regarding Plaintiff's credibility, the ALJ sets out the reasons she finds Plaintiff less than completely credible: the lack of objective verification of alleged limited activities of daily living; the difficulty attributing the alleged degree of limitation to Plaintiff's medical conditions as opposed to other factors; and the inconsistent information Plaintiff has provided regarding her activities of daily living. (R. 53-54.)

ALJ Zanotto considered and weighed the opinion evidence, first concluding that Dr. Hershey's opinion regarding headaches was entitled to significant weight as it related to deficits in concentration attributable to migraine headaches and factors which aggravate the migraines. (R. 54.) The ALJ found the opinion entitled to little weight as it related to absenteeism associated with the condition because of the speculative nature of the assessment and its inconsistency with his own records. (*Id.*)

23

The ALJ assigns significant weight to the State agency psychological consultant's opinions.  (R. 55.)  After recognizing the non-examining nature of Dr. Rightmyer's opinions, ALJ Zanotto found them consistent with the record as a whole and Plaintiff's admitted abilities.  (*Id.*)

ALJ Zanotto also assigned varying weight to Dr. Pugh's opinions.  (R. 55-57.)  She noted the undated opinion, the May 2012 opinion, and the September 2012 opinion were entitled to significant weight in some respects and were partially supportive of her findings to the extent that no more than moderate functional loss is suggested by the opinions.[2]  (R. 55-56.)  The ALJ afforded the opinions little weight to the extent Dr. Pugh suggested marked and extreme limitations in that they contain no objective findings, are not supported by objective evidence in his treatment records, there is no indicator for any other objective basis for his opinions, and the opinions are inconsistent.  (R. 56.)

Regarding Plantiff's GAF scores ranging from 49 to 50 during the period at issue, the ALJ notes they are assigned little weight for several reasons including that GAF scores can be based on subjective, unsubstantiated complaints and behaviors that have little or no relationship to occupational functioning.  (R. 56.) The ALJ further concludes that, although a score in this range

---

[2]  The ALJ presumed Dr. Pugh's undated opinion was from one of Plaintiff's earlier disability filings.  (R. 55.)

"indicates serious symptoms that could suggest an inability to hold a job, it does not necessarily mean that a person is unable to meet the basic mental demands of competitive, remunerative, unskilled employment." (R. 57.)  She finds this principle particularly applicable in this case because Dr. Pugh's notes indicate that he encouraged Plaintiff to seek stable employment and pursue other choices that would lead to self-sufficiency despite such GAF scores. (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in

the national economy.  (R. 29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.

2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff alleges the ALJ determination that Plaintiff could perform a range of unskilled work is not supported by substantial evidence, specifically pointing to the ALJ's consideration of the opinions of Dr. Hershey and Dr. Pugh, and her assessment of Plaintiff's credibility.  (Doc. 7 at 16-21.)  Defendant maintains that substantial evidence supports the ALJ's RFC based on the medical and non-medical evidence of record.  (Doc. 10 at 6-7.)  I conclude that Plaintiff has not shown that the ALJ erred on the bases alleged.

## A.   *Treating Source Opinions*

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

30

substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[4] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social*

---

[4] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

*Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

1.  **Dr. Hershey's Opinion**

First Plaintiff argues that the ALJ did not properly consider

Dr. Hershey's opinion.  (Doc. 7 at 16.)  Plaintiff faults
consideration of Dr. Hershey's opinion related to the ALJ finding
Plaintiff capable of unskilled work with the assertion that
affording significant weight to his opinion on this basis is not
consistent with his opinion--he did not opine that Plaintiff would
be limited to unskilled tasks when she got a headache but rather
that she would be unable to perform basic work activities and would
need to leave the workplace.  (*Id.*)  Plaintiff does not further
develop this argument so little discussion of the issue is
warranted.  However, I note that I do not read the ALJ's
consideration of Dr. Hershey's opinion to attribute Plaintiff's
ability to perform unskilled work to him.  (*See* R. 54.)  Rather,
ALJ Zanotto attributes to Dr. Hershey his determination that
Plaintiff's pain would be severe enough to interfere with her
concentration--a statement which is consistent with his finding
that this would "periodically" be the case but it was difficult for
him to know.  (R. 54, 600.)

Plaintiff next contends that the ALJ did not properly reject
Dr. Hershey's estimation of Plaintiff's absences in that the ALJ
suggests she is in a better position to make such an estimation.
(Doc. 7 at 16-17.)  This argument is presented in a conclusory
fashion.  (*Id.*)  After noting the necessarily speculative nature of
the response, the ALJ also gave little weight to the estimation
because it was inconsistent with Dr. Hershey's own records and

34

lacked objective support in the record.  (R. 54.)

Plaintiff also disputes the ALJ's finding that Dr. Hershey's records "consistently describ[e] a 'controlled headache disorder,'" pointing to notes which document periods of worsening, at times daily, headaches and periods of improvement. (Doc. 7 at 17.)  As the review of evidence set out above indicates, Plaintiff's statement is partially true.  However, Dr. Hershey's records consistently documented a controlled headache disorder when Plaintiff resumed taking  medication in December 2011 following the birth of her daughter and no records show evidence of a regression thereafter.  (R. 726, 734, 751, 770, 772, 781.)  As Dr. Hershey's opinion was rendered in September 2013 when no records for the previous twenty months indicate that the headache disorder was not controlled, I do not conclude the ALJ erred on this basis.

This determination also addresses Plaintiff's assertion that "there is not a single piece of evidence in the record . . . that contradicts the opinion of Dr. Hershey." (Doc. 7 at 17.)  It is Dr. Hershey's own records which contradict his opinion--as noted by the ALJ, records describing a controlled headache disorder requiring minor treatment are inconsistent with headaches of the frequency and severity referenced in the September 2013 opinion. (*See* R. 54.)

**2.   Dr. Pugh's Opinions**

Regarding consideration of Dr. Pugh's opinions, Plaintiff

first asserts that "[t]o the extent the ALJ is suggesting that Plaintiff was being treated merely for 'family strife' this is an unreasonable reading of the record." (Doc. 7 at 18.)  I do not read the ALJ's consideration of Dr. Pugh's opinions to make any such suggestion.  Rather, the evidence set out above shows the ALJ correctly noted that Dr. Pugh recorded Plaintiff's subjective reports of family strife.  (*Id.*)  Importantly, there is no suggestion that ALJ Zanotto found that Plaintiff' was being treated "merely" for family issues in that she also references Plaintiff's reported symptoms and recognizes Plaintiff's bipolar disorder and PTSD as severe impairments.  (R. 46, 56.)

Addressing Plaintiff's more general contention that there is objective support for Dr. Pugh's opinions, a review of Dr. Pugh's treatment records indicates a lack of objective findings.  *See supra* pp. 4-8.  While Plaintiff is correct that some objective findings can be found in Dr. Pugh's May 2012 evaluation (Doc. 7 at 19; R. 503-05), the limited objective findings in his evaluation do not undermine the ALJ's statements that "there is no objective evidence in his *treatment records* to support the marked and extreme limitations reported" and "it appears Dr. Pugh relied *quite heavily* on the subjective report of symptoms and limitations provided by the claimant."  (R. 56 (citations omitted) (emphasis added).) Furthermore, Plaintiff does not argue how the cited observations support the marked and extreme limitations discounted by the ALJ,

she merely concludes that "the ALJ's claim that they are unsupported is unreasonable." (*See* Doc. 7 at 18-19.)  This type of conclusory assertion is insufficient to satisfy Plaintiff's burden of showing error.

This determination is bolstered by the fact that some assessments cited by Plaintiff--including observations contained in the May 2012 evaluation regarding rapid speech, depressed mood and mostly flat affect, psychomotor retardation, preoccupation with everyday matters/overwhelmed/obsessive/paranoid, poor social judgment, trauma related impaired abilities, limited mental stamina and low energy (Doc. 7 at 18)--were in fact often more qualified and nuanced in Dr. Pugh's opinion.  (*See* R. 503-05.)  For example, Dr. Pugh assessed *slight* psychomotor retardation, speech which was *at times* rapid, her mood was *moderately* depressed, and she was *somewhat* impaired due to childhood trauma.  (R. 504 (emphasis added).)

More importantly, ALJ Zanotto points to extensive contradictory evidence regarding Plaintiff's mental health impairments and her allegations concerning their limiting effects. (R. 51-52, 56.)  As set out above, *see supra* pp. 8-9, and noted by the ALJ (R. 51-52), Dr. Hershey often noted that Plaintiff had normal affect and was not depressed, the records show a good response to medication when Plaintiff was taking it, Plaintiff had only routine and conservative treatment and only sporadically

37

attended therapy, and Plaintiff's impairments did not prevent her from working in the past.

Plaintiff also criticizes the ALJ's consideration of GAF scores of 49 and 50 assessed by Dr. Pugh.  (Doc. 7 at 19.) Plaintiff specifically takes issue with ALJ Zanotto's finding that Dr. Pugh's encouragement of Plaintiff to seek stable employment or pursue education, housing, and relationship choices that would lead to stable employment and self-sufficiency is suggestive of a belief that Plaintiff is capable of these things despite the assessed GAF scores.  (*Id.*; R. 57.)  In support of her assertion that this is an unfair reading of the record, Plaintiff points to the following: Dr. Pugh "*never* indicated she was ready to work or take classes on a full-time basis" (Doc. 7 at 19); it was Dr. Pugh who told Plaintiff to stop working in April 2010 and counseled her that she was not ready to return to work though she may be ready sometime in the future (*id.* at 20 (citing R. 75, 98)); Dr. Pugh noted that "'she has repeatedly failed over again to be successful without regressing into symptoms that are more than just a psychosocial adjustment'" (*id.* (quoting R. 303)); and Dr. Pugh stated "'this attempt to reenter the world of academia has shaken her confidence that is already weak'" (*id.* (quoting R. 590)).

I conclude that Plaintiff's reliance on the asserted record support is misplaced in that a contextual review of the referenced evidence does not show inconsistency with the ALJ's finding.

First, a fair inference that Dr. Pugh believed Plaintiff was ready to work can be derived from his May 2010 notation that "Sheena needs to look out for herself and *get back to work* and find her own place to deal with him more appropriately from a position of strength rather than great dependency." (R. 566 (empasis added).)

Second, while Plaintiff asserts it was Dr. Pugh who told her to stop working, her citations to the record reference her ALJ hearing testimony on October 29, 2013, and the testimony is not supported by Dr. Pugh's notes. Rather, on May 4, 2010, (the second time Dr. Pugh saw Plaintiff after the April 2010 fire), he noted that Plaintiff may need to take a hiatus *from academic work* at the end of the semester. (R. 564-65.) To the extent Plaintiff stated in her testimony that Dr. Pugh was the one who told her to take a medical leave after the April 2010 house fire (R. 75), the records show that Dr. Hershey recorded on April 25, 2010 (two days before Plaintiff's visit with Dr. Pugh), that Plaintiff was planning to take a medical leave from work and wanted him to complete Family Medical Leave Act ("FMLA") paperwork. (R. 627.) Further, even if Dr. Pugh did recommend in April 2010 that Plaintiff take some time off from work, as set out above, he recommended she get back to work on May 18, 2010. (R. 566.) Plaintiff's other citation to her hearing testimony supports only that she stated Dr. Pugh told her it was not a good idea for her to return to work. (R. 98.) My

review of Dr. Pugh's notes reveals no such recommendation.[5]

Third, Plaintiff's quotation regarding Dr. Pugh's statement about her failure to be successful is found in his July 6, 2010, Progress Note where he also states that "[e]ven though she has bipolar illness and possible diabetes, it may be difficult to prove a case of permanent disability." (R. 303, 568.)  He made a similar statement on June 13, 2012, when he noted that he informed Plaintiff "that a diagnosis is not enough to gain disability" after she had expressed a belief that she would eventually be awarded benefits. (R. 574.)  A fair inference can be drawn from these statements that Dr. Pugh had reservations about her qualifying for benefits.

Fourth, when considered in context, Plaintiff's reference to Dr. Pugh's notation that "'this attempt to reenter the world of academia has shaken her confidence that is already weak'" (Doc. 12 at 20 (quoting R. 590)) supports rather than undermines the ALJ's determination.  Dr. Pugh made this statement in his May 22, 2013, notes.  (R. 590.)  Preceding the cited quotation, Dr. Pugh stated that Plaintiff was "restarting her early childhood program at HACC

---

[5]  In Dr. Pugh's attorney-requested correspondence of July 16, 2012, he stated that "[i]f she were to attempt to work now, it would be worse than when she was taking the full course of medication," after noting "[c]urrently, she is not taking medication because her infant daughter is nursing."  (R. 508.) These statements taken together point at most to a temporary increased difficulty in sustaining employment.  In general, many averments contained in the correspondence are contradicted by other evidence of record.

so she can work and care for her daughter in the facility but also earn an income." (R. 590.) Following his statement about Plaintiff's shaken confidence, he notes that Plaintiff thought of specific steps to boost her confidence and specific means to accomplish them were discussed. (*Id.*) Dr. Pugh expressed absolutely no reservations about Plaintiff's plans, which included going to school and working in a childcare facility.

Finally, Plaintiff's assertion that the ALJ did not properly assess Plaintiff's credibility in undermining the GAF scores on the basis of reliance on subjectively-reported symptoms is stated in a conclusory manner. (Doc. 7 at 20.) As such, no further discussion is warranted.

In sum, although Plaintiff is correct that an ALJ should not substitute her opinion for that of the medical opinion of experts (Doc. 7 at 18), this principle applies where the treating source opinion is well supported. 20 C.F.R. § 404.1527(c)(2); *Morales*, 225 F.3d at 317; *Drejka*, 61 F. App'x at 782. The review of evidence set out above and a proper reading of the ALJ's decision regarding the opinions of Dr. Hershey and Dr. Pugh show that she relied on far more than personal observations and credibility determinations and, therefore, she has not run afoul of relevant regulations and Third Circuit caselaw in discounting the opinions provided by Dr. Pugh and Dr. Hershey. *See*, *e.g.*, *Drejka*, 61 F. App'x at 782.

41

**B.   Credibility**

Plaintiff contends that the ALJ's finding that Plaintiff was not credible is based on some unreasonable assumptions.  (Doc. 7 at 20.)  Defendant responds that Plaintiff challenges only portions of the ALJ's credibility analysis and the limited challenges are without merit.  (Doc. 10 at 21.)  I conclude Plaintiff has not shown that the ALJ erred in her credibility anlysis.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).  An ALJ is not required to specifically mention relevant Social Security Rulings.  *See Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003).  It is enough that his analysis by and large comports with relevant provisions.  *Id.*

Plaintiff points to two allegedly flawed "assumptions" in support of her assertion.  (Doc. 7 at 20.)  Even if the two assumptions cited were problematic, the ALJ's thorough credibility

42

assessment rests on far more.  (See R. 51-54.)  Thus, Plaintiff's claimed error does not undermine the ALJ's RFC determination.

### V. Conclusion

For the reasons discussed above, Plaintiff has failed to show that the ALJ's RFC determination is not supported by substantial evidence.  Thus, based on the evidence before the ALJ, I conclude Plaintiff's claimed errors are not cause for remand, and Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: February 8, 2016

43